UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

T.H. EIFERT, INC., et al.,

        Plaintiffs,                        FILE NO. 5:05-CV-107

v.                                    HON. ROBERT HOLMES BELL

UNITED ASSOCIATION OF
JOURNEYMEN AND APPRENTICES
OF THE PLUMBING AND
PIPEFITTING INDUSTRY OF THE
UNITED STATES AND CANADA, et al.,

        Defendants.
_____/

## OPINION

    This is an action under Sections 301 and 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 185, 187, filed by Plaintiffs T.H. Eifert, Inc. ("Eifert") and Dard Incorporated ("Dard") alleging breach of a collective bargaining agreement and violation of Section 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4), together with several state-law tort claims. Defendant United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada ("United Association") filed a motion to dismiss the amended complaint (Docket #37). Defendants Local 333 of that union ("Local 333") and union officers Abe Rahar ("Rahar") and Tim Haggart ("Haggart") filed a separate motion to dismiss (Docket #39). The matter

presently is before the Court on both motions to dismiss.  For the reasons that follow, the motions are granted.

## I.

The following facts are taken from the complaint in the light most favorable to Plaintiffs.

Both Dard and Eifert are mechanical contractors who are members of a contractor association group, the Mid-Michigan Mechanical Contractors Association (MMMCA), which itself is an affiliate of the Mechanical Service Contractors of America (MSCA).  The MSCA and Defendant United Association are signatories to a collective bargaining agreement, referred to as the National Service and Maintenance Agreement (NSMA or "National Agreement").  The MMMCA and Local 333 are signatories to another collective bargaining agreement (the "Master Agreement").  The relationships between Plaintiffs and Defendants and Plaintiffs' service employees are governed by the two agreements.

Under Article X of the National Agreement, the employer must fill its employment openings by first making a request to the home local union for qualified personnel.  Upon receiving such request, the local union agrees to furnish duly qualified people with the skills necessary in a sufficient number to execute the employer's work.  Article XIII provides that the union is the sole and exclusive source of referral of applicants for employment.  Article XX mandates that disagreements under the contract be submitted to a grievance arbitration

2

process, culminating in binding arbitration.  Article XVIII, however, includes a "no strike no

lockout" clause, which provides:

> Neither the Union nor any of the Employees covered by this Agreement will
> collectively, concertedly or individually induce, engage or participate, directly
> or indirectly, in any strike, picketing, slowdown, stoppage or other curtailment
> or interference with the Employer's operations . . . . The Union agrees to exert
> every effort through its international and local officers and representatives to
> end any unauthorized interruption of work. . . .

Article XVIII also includes special provisions for the resolution of described interferences

with the employer's operations:

> The parties agree that, in the manner set forth in Article XX, they will submit
> to arbitration all grievances and disputes that may arise between them and any
> misunderstandings to the meaning or intent of all or any part of this
> Agreement.  However, the Employer shall not be required to resort to the
> grievance arbitration procedures prior to resorting to other remedies in the
> event of a violation of this Article.  In the event of a lockout, or a strike,
> slowdown, work stoppage, or other curtailment or interference with the
> Employer's operation the parties agree that any claims for relief, including
> damages, are to be immediately submitted to arbitration following the
> grievance procedure as set forth in Article XX.  However, under these
> circumstances, the grievance procedure shall commence with Step 4(b),
> specified in Article XX, Paragraph 68.

Step 4b of Article XX provides:

> Step 4(b): (This step of the grievance procedure applicable ONLY to any
> grievance involving a lockout or any strike, picketing, slowdown, stoppage or
> other curtailment or interference with the Employer's operations. . .).  The
> grievance shall be reduced to writing in terms of the issues to be arbitrated and
> shall be filed. . . . (Compl. Ex. 1, p.12).

According to the complaint, Eifert elected to implement certain unspecified contract

provisions that were favorable to it.  Defendants allegedly discriminated against Eifert and

3

in favor of MMMCA members who did not implement such provisions.  Such alleged discrimination includes the coercion of Eifert employees to quit their jobs with Eifert and accept employment with other MMMCA contractors.

In 2003 and 2004, Dard and Eifert, through their respective owners Rebecca Wade and Tom Eifert, began discussions about a possible sale of the Dard service department to Eifert.  On or about January 14, 2005, Wade told Defendant Rahar that she was considering selling Dard to Eifert.  Rahar purportedly told Wade not to sell to Eifert because his employees were not from Local 333 and there were other contractors that would buy Dard. On January 20, 2005, Tom Eifert and Wade met with two of Dard's five service employees, Craig Sperry and Jason Wood, about the potential sale of Dard to Eifert.  Both Wood and Sperry allegedly indicated to Wade and Eifert that they would work for Eifert, if the sale were completed.  Three days later, on January 23, 2005, Wood informed Wade that he was immediately quitting his employment with Dard.  On January 27, 2005, Eifert and Wade met with another two of Dard's service employees, Al Edgeworth and Mick McNamara. According to the complaint, both Edgeworth and McNamara expressed their willingness to work for Eifert in the event of a sale.

One day later, on January 28, 2005, Defendant Rahar allegedly called Wade to inquire what he could do to stop the exodus of Dard's employees.  Wade requested that Rahar attempt to convince the employees to at least try the employment with Eifert for 30 days. Later that day, the four remaining Dard service employees, Sperry, Wood, McNamara and

4

Alan Nequette, met with Wade and informed her that they would not work for Eifert if the business was sold.  None of the employees gave a reason for his decision.

On February 1, 2005, Local 333 business manager Davis scheduled a meeting at the local union hall.  The following individuals were present at the meeting: Davis, Defendant Haggart, Defendant Rahar, Tom Eifert, Miller, Wade, Edgeworth, Nequette, McNamara and Sperry.  The participants discussed Wood's resignation and the refusal of the other Dard service employees to work for Eifert in the event of a sale.  No resolution was reached. Wade informed those present that she intended to cease operating Dard as a business.

On February 3, 2005, Edgeworth and Sperry quit Dard without notice or reason.  On February 4, 2005, the final Dard service employees, McNamara and Nequette quit Dard without notice or reason.  Shortly thereafter, Nequette began working for another MMMCA member, Gunthorpe Plumbing and Heating, where he performed essentially the same service work for most of the same customers he had served while at Dard.  Those customers were not previously customers of Gunthorpe.  With the exception of McNamara, the remaining service employees who left Dard are now working for other MMMCA members.

The amended complaint alleges five counts: (1) tortious interference with business relationship, expectancy and/or contract between Dard and Eifert by Defendants Local 333, Rahar and Haggart; (2) tortious interference with business relationship or expectancy between Dard and its employees by Defendants Local 333, Rahar and Haggart; (3) tortious interference with business relationship between Dard and its customers by Defendants Local

333, Rahar and Haggart; (4) breach of a collective bargaining agreement by Defendants United Association and Local 333, in violation of Section 301 of the Labor Management Relations Act (LMRA); and (5) violation of Section 303 of the LMRA by Defendant Local 333.

Specifically, Plaintiffs allege that Defendants Local 333, through Haggart and Rahar, discriminated against Eifert because Eifert implemented certain contractual terms that were beneficial to it and that the union did not prefer.  Plaintiffs allege that Haggart and Rahar coerced, intimidated and influenced Dard service employees to quit employment with Dard in order to keep them from working for Eifert.  Because customer relationships typically are formed between the service employees and their clients (rather than between the service company and the clients), the movement of Dard employees to different companies left Dard without either employees or customers.  As a result, the anticipated sale of Dard to Eiffert was never completed, and the value of the Dard service department was eviscerated.

## II.

Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, pursuant to FED. R. CIV. P. 12(b)(6), and for lack of subject matter jurisdiction, pursuant to FED. R. CIV. P. 12(b)(1).

Under Rule 12(b)(6), a complaint may be dismissed if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Hishon v. King & Spalding*,

6

467 U.S. 69, 73 (1984).   The standard requires that a "complaint must contain either direct or inferential allegations repecting all the material elements to sustain a recovery under some viable legal theory." *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 346 (6th Cir. 2001).   The complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).   However, the court need not accept as true legal conclusions or unwarranted factual inferences. *Lewis v. ACB Business Serv., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998).   A complaint fails to state a claim upon which relief can be granted when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. *Jones v. City of Carlisle*, 3 F.3d 945, 947 (6th Cir. 1993).

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).   "Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990); *Rogers v. Stratton Industries, Inc.*, 798 F.2d 913, 915 (6th Cir. 1986).   To meet that burden, the plaintiff must show that the complaint "alleges a claim under federal law, and that the claim is 'substantial.'" *Musson Theatrical, Inc. v. Fed'l Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996).   The plaintiff will survive the

7

motion to dismiss by showing "any arguable basis in law" for the claims set forth in the complaint. *Id.* In conducting its review, a court must "construe the complaint in a light most favorable to the plaintiff, accept as true all of plaintiff's well-pleaded factual allegations, and determine whether the plaintiff can prove no set of facts supporting [the] claims that would entitle him to relief." *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 408 (6th Cir. 1997).

## III.

Defendant United Association has been named as a defendant only in Count IV of the complaint, which alleges breach of the collective bargaining agreement under § 301 of the LMRA, 29 U.S.C. § 185. In its motion to dismiss, United Association raises the following arguments: (1) the court lacks jurisdiction over Count IV because Plaintiffs failed to meet the jurisdictional prerequisite of exhausting their administrative remedies by submitting their contractual issues to the grievance and arbitration procedure of the collective bargaining agreement; (2) the complaint fails to allege a factual basis upon which United Association may be held liable for the actions of Local 333, Rahar and Haggart; and (3) the complaint fails to allege a factual basis upon which United Association may be held liable for breach of its contractual duty to exert its best efforts to end any unauthorized interruption of work.

Defendants Local 333, Rahar and Haggart join in United Association's first argument. In addition, these Defendants raise the following arguments: (1) Plaintiffs have failed to allege facts supporting their conclusory allegation that Local 333, Rahar and Haggart

"encouraged, restrained, influenced, coerced, and interfered with" Dard employees; (2) the

state-law tort claims (Counts I through III) are barred by the complete preemption doctrine

of § 301 of the LMRA; (3) the state-law tort claims are preempted under the National Labor

Relations Act (NLRA), pursuant to *San Diego Bldg. Trades v. Garmon*, 359 U.S. 236, 245

(1959); (4) because Section 301 does not provide for the recovery of damages from

individual union officers and Plaintiffs have failed to request injunctive or declaratory relief,

Rahar and Haggart must be dismissed from the Section 301 claim; and (5) Count V of the

complaint, alleging violation of § 303 of the LMRA, fails to state a claim upon which relief

can be granted.  The Court also ordered supplemental briefing on the question whether the

arbitration clause of the collective bargaining agreement also mandates arbitration of the

§ 303 claim.

      A.    <u>Count IV: Breach of Collective Bargaining Agreement</u>

Count IV of the complaint, raised pursuant to Section 301 of the LMRA, alleges that

all of the Defendants breached the previously quoted no-strike provision set forth in Article

XVIII of the National Agreement.  Defendants contend that this Court lacks jurisdiction to

consider the claim because Plaintiffs failed to exhaust their administrative remedies in

accordance with the arbitration clause of the agreement.

Section 301 of the LMRA grants district courts jurisdiction over a suit alleging

violation of a collective bargaining agreement:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  However, in cases under § 301, courts apply a strong presumption of arbitrability to disputes involving a collective bargaining agreement with an arbitration clause. *United Steelworkers of Am. v. Mead Corp.*, 21 F.3d 128, 131 (6th Cir. 1994).  Where an agreement for arbitration exists, the court must apply a presumption of arbitrability and must resolve any ambiguity in favor of arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers*, 21 F.3d at 131 (quoting *AT&T Tech. v. Comm. Workers of Am.*, 475 U.S. 643, 650 (1986); *United Steelworkers of Am. V. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).  When the arbitration clause in issue is a broad one, the presumption of arbitrability is "particularly applicable." *AT&T*, 475 U.S. at 650.  Where an arbitration clause covers the dispute, the pursuit of grievance and arbitration is a prerequisite to the filing of a § 301 action. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 219 (1985); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563 (1976).

As the Court previously has noted, Article XVIII prohibits signatories to the agreement from engaging in "any strike, picketing, slowdown, stoppage or other curtailment or interference with the Employer's operations . . . ."  Article XVIII also includes special provisions for the resolution of claimed interferences with the employer's operations:

> The parties agree that, in the manner set forth in Article XX, they will submit to arbitration all grievances and disputes that may arise between them and any misunderstandings to the meaning or intent of all or any part of this Agreement. However, the Employer shall not be required to resort to the grievance arbitration procedures prior to resorting to other remedies in the event of a violation of this Article. In the event of a lockout, or a strike, slowdown, work stoppage, or other curtailment or interference with the Employer's operation the parties agree that any claims for relief, including damages, are to be immediately submitted to arbitration following the grievance procedure as set forth in Article XX. However, under these circumstances, the grievance procedure shall commence with Step 4(b), specified in Article XX, Paragraph 68.

Plaintiffs contend that the second sentence of the provision gives them the immediate right to pursue "other remedies." They construe "other remedies" to mean that the clause preserves their right to bring their § 301 claim without having first to proceed to arbitration. In contrast, Defendants contend that, when read in conjunction with the third sentence of the provision, the second sentence refers only to the ability to seek relief other than damages, such as injunctive relief. They further contend that the provision as a whole requires complaints under Article XVIII to be brought to the abbreviated grievance process set forth in the third sentence.

Viewing the entire no-strike provision as a whole, and giving meaning to each of the terms, *see United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-83 (1960), the Court is persuaded that Plaintiffs' § 301 claim is within the arbitration clause of the agreement. The first sentence of the quoted passage expressly refers all disputes concerning the contract to the grievance arbitration procedures of Article 20. The second sentence states that the employer does not have to go through those procedures to pursue

"other remedies" for violations of Article 18. That sentence, however, does not explicitly exempt claims alleging violations of the no-strike provision from the obligation to arbitrate. Instead, the language of the second sentence speaks in terms of other remedies, more generally encompassing the scope of relief, not the cause of action. Further, the third sentence expressly states that the parties agree to proceed to an immediate arbitration provision that applies only to Article XVIII violations. The sentence would be irrelevant if the Court were to accept the Plaintiffs' argument. Plaintiffs urge that the language of the third sentence is not rendered irrelevant if the language is reconciled to permit the parties to elect in the alternative to proceed either directly to court or to the abbreviated grievance/arbitration process. That proposed means of reconciling the language, however, is at odds with the mandatory language of the third sentence. The Court concludes, therefore, that the best reading of the language is the one presented by Defendants.

However, even assuming the provision arguably could be read to provide immediate access to the court for violations of Article XVIII, the text of the provision is at best ambiguous. In contrast, the language of the arbitration clause is very broad, providing that the parties "will submit to arbitration all grievances and disputes that may arise between them and any misunderstandings to the meaning or intent of all of [sic] any part of this Agreement." Where the language of an arbitration clause is broad, the presumption of arbitrability is particularly strong. *AT&T*, 475 U.S. at 650. Applying the heightened presumption due such broad clauses, *see AT&T*, 475 U.S. at 650*, the agreement clearly

requires Plaintiffs to arbitrate alleged violations of the no-strike clause by way of the abbreviated grievance/arbitration procedure set forth in Article XX, ¶ 68, Step 4(b).

Plaintiffs argue that, even if one plausible interpretation of the arbitration clause of Article XVIII requires arbitration, the Court must permit discovery into the parties' intent and must not dismiss the claim on a Rule 12(b) motion. The Court rejects Plaintiffs' proposition. First, the Court has held that the most reasonable reading of the provision does not express an intent to exclude violations of the no-strike clause from arbitration. Moreover, the effect of the presumption of arbitrability is to resolve ambiguity of language in favor of arbitration. *See AT&T*, 475 U.S. at 650. *See also United Food and Comm. Workers v. Fresh Mark*, 81 F. App'x 23 (6th Cir. 2003) (affirming dismissal on pleadings when district court applied presumption of arbitrability to ambiguous clause); *United Steelworkers of Am. v. Century Aluminum*, No. 04-5991, 2005 WL 3338257 (6th Cir. Dec. 8, 2005) (affirming application of presumption on motion to dismiss); *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers*, No. 91-6259, 1992 WL 163251, at *2-3 (6th Cir. July 14, 1992) (affirming district court's dismissal because dispute was presumptively arbitrable under clause). The language of the instant agreement not only allows but most reasonably is construed to require arbitration. Extrinsic evidence is not permitted to contradict the language of the contract that, in light of the strong presumption of arbitrability, is clear. *See Domino Sugar Corp. v. Sugar Workers Local Union 392*, 10 F.3d 1064, 1070 n.2 (4th Cir. 1993) (expressly holding that

13

dismissal under Rule 12(b)(6) was appropriate where language of the agreement did not clearly exclude claim from arbitration).

In light of the Court's conclusion that the claim was within the arbitration clause, Plaintiffs were required to submit their breach-of-contract claim to arbitration. Count IV of the complaint therefore will be dismissed as against all of the Defendants for lack of jurisdiction. The Court need not and does not address the remaining claims of Defendant United Association.

B.     Count V: Violation of Section 303 of the LMRA

In Count V of the complaint, Plaintiffs raise a claim under Section 303 of the LMRA, alleging that Defendant Local 333 violated Section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4). Section 303 of the LMRA states:

> It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

29 U.S.C. § 187. Section 158(b)(4), in turn, states in relevant part:

> It shall be an unfair labor practice for a labor organization or its agents –
>
> (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is –

14

* * *

to cease doing business with any other person . . . .

29 U.S.C. § 158(b)(4).

### 1.    Arbitrability of § 303 claim

The Supreme Court on several occasions has addressed whether an arbitration clause of a collective bargaining agreement may successfully waive a federal action for violation of statutory rights.  First, in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), the Court considered whether an arbitration clause that covered "'differences aris(ing) between the Company and the Union as to the meaning and application of the provisions of the Agreement' and 'any trouble aris(ing) in the plant'" barred an employee's Title VII claim in federal court.  *Id.* at 40.  The Court held that a collective bargaining agreement could not prospectively waive an employee's right to a federal judicial forum under Title VII.  *Id.* at 51.  In reaching its decision, the Court noted that "a labor arbitrator has authority only to resolve questions of contractual rights."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 34 (1991) (citing *Gardner-Denver*, 415 U.S. at 53).  The Court further noted that the arbitrator had "no general authority to invoke public laws that conflict with the bargain between the parties . . . ."  *Id.* at 53.

Seventeen years later, the Court addressed whether an employee could waive his own statutory right to a judicial forum as part of a voluntary employment agreement.  *See Gilmer*, 500 U.S. at 35.  The Court distinguished *Gardner-Denver* on the grounds that it addressed

15

a union's negotiated waiver of individual statutory claims. *Id.* The *Gilmer* Court, reflecting a substantially liberalized view of arbitration, concluded that an individual could validly waive his federal discrimination claims in favor of arbitration. *Id.* (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985)).

After *Gilmer*, courts struggled with the apparent tension between *Gardner-Denver* and *Gilmer*. In *Wright v. Universal Maritime Serv.*, 525 U.S. 70 (1998), the Supreme Court acknowledged but declined to resolve that apparent tension, distinguishing the cases. The *Wright* Court considered whether an arbitration clause contained in a collective bargaining agreement successfully waived an employee's right to a judicial forum for his claim under the Americans with Disabilities Act (ADA). The Court held that the presumption of arbitrability applied to arbitration clauses contained in collective bargaining agreements has a limited application. That presumption "does not extend beyond the reach of the principal rationale that justifies is, which is that arbitrators are in a better position than courts *to interpret the terms of a CBA*." *Wright*, 525 U.S. at 78 (emphasis in original). Where the question in issue is whether a party to a collective bargaining agreement has waived a statutory right as opposed to a contractual one, a court will not presume that such a claim is within the scope of the arbitration provision. *Id.* at 79. "It may well be that ordinary textual analysis of a CBA will show that matters which go beyond the interpretation and application of contract terms are subject to arbitration; but they will not be *presumed* to be so." *Id.* (emphasis in original). Indeed, the Supreme Court went further:

16

> Not only is a petitioner's statutory claim not subject to a presumption of arbitrability; we think any CBA requirement to arbitrate it must be particularly clear. . . . "[W]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.'" More succinctly, the waiver must be clear and unmistakable."

*Id.* (quoting *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983)).

After *Wright*, the Sixth Circuit "joined the 'overwhelming majority of the courts of appeal [which] have determined that employees covered by CBAs containing mandatory arbitration clauses retain the right to pursue statutory employment discrimination claims in federal court.'" *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 630 (6th Cir. 1999) (quoting *Blakely v. USAirways, Inc.*, 23 F. Supp. 2d 560, 574 (W.D. Pa. 1998) (citing cases)).

Defendant Local 333 suggests that the *Wright* "clear-and-unmistakable" standard does not apply to employer waivers of statutory rights, but only to union waivers of employee statutory rights. For this proposition, Defendant cites *Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending Machines, Local No. 550*, 167 F.3d 764 (2d Cir. 1999). In *Interstate Brands*, the Second Circuit considered the application of the *Wright* "clear and unmistakable" standard. The *Interstate Brands* court held first that the standard was based on a concern about the waiver of individual rights by someone else, *i.e.*, the union. *Id.* at 767. The court held that the same concern did not apply to an employer that negotiated and signed an agreement on its own behalf. *Id.* In that context, the court held that the court did not need to find the waiver to be clear and unmistakable. Instead, the court need only to find

that, without applying any presumption favoring arbitrability, the language of the arbitration clause encompasses the statutory claim. *Id.* at 768.

The Second Circuit in *Interstate Brands* also considered the continuing viability of its own prior decision in *Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Local 584*, 359 F.2d 598 (2d Cir. 1996), which prohibited the waiver of § 8(b)(4) rights in an arbitration clause contained in a collective bargaining agreement. *Id.* at 767-69.[1] The court distinguished *Old Dutch Farms* without overruling it, finding that the arbitration clause in *Old Dutch Farms* was not as broad as that presented in *Interstate Brands*. *Id.* at 769.

The Sixth Circuit has not yet spoken on the question whether an arbitration clause in a collective bargaining agreement may waive a federal LMRA § 303 action raising a violation of § 8(b)(4) of the NLRA. This circuit, however, has stringently applied the *Wright* standard in the context of employee claims. *See, e.g., Morrison v. Warren*, 375 F.3d 468, 474 (6th Cir. 2004); *Mitchell v. Chapman*, 434 F.3d 811, 824 (6th Cir. 2003); *Bratten*, 185 F.3d at 630. Moreover, and more significantly, the employers in the instant case are more similarly situated to represented employees than to the employer in *Interstate Brands*. Here, both Dard and Eifert were members of the Mid-Michigan Mechanical Contractors

---

[1]Prior to *Wright*, cases other than *Old Dutch Farm* also had decided that arbitration clauses did not bar § 303 actions. *See, e.g., Twin Excavating Co. v. Local Union No. 731, Excavating, Grading, Asphalt, Private Scavengers and Automobile Salesroom Garage Attendants*, 337 F.2d 437, 438 (7th Cir. 1964); *Vulcan Materials Co. v. United Steelworkers of Am.*, 430 F.2d 446 (5th Cir. 1970); *Waco Scaffolding Co. v. Local 845, United Bhd. of Carpenters & Joiners of Am.*, 585 F. Supp. 102 (E.D. Pa. 1984).

Association (MMMCA).  The MMMCA, in turn, was an affiliate of the MSCA, the
Mechanical Service Contractors of America.  The National Agreement, which contains the
critical arbitration clause, was negotiated on behalf of the member associations and
contractors by the MSCA.  The Master Agreement between the MMMCA and Defendant
was negotiated by the MMMCA.  In neither case did either employer directly negotiate or
sign the agreement.  As a consequence, the rationale applied by the Supreme Court in *Wright*
and the Second Circuit in *Interstate Brands* also applies to Plaintiffs.  *Wright*, 525 U.S. at 80-
81; *Interstate Brands*, 167 F.3d at 767.  The Court therefore concludes that Plaintiffs' § 303
claims may only be considered barred if the arbitration clause clearly and unmistakably
waives the judicial forum for such claims.

Applying that standard, the Court finds no clear and unmistakable waiver of the
federal judicial forum.  Although the initial part of the arbitration clause of Article XVIII of
the National Agreement is quite broad, stating that the parties "will submit to arbitration all
grievances and disputes that may arise between them and any misunderstandings to the
meaning or intent of all or any part of this Agreement . . . , it does not clearly and
unmistakably waive federal statutory claims."  Instead, contrary to the suggestion of
Defendant Local 333, the first clause of the provision can be given meaning without
rendering meaningless the second clause.  If "all grievances and disputes that may arise
between them" is construed to refer to disputes over the *application* of the agreement, the
second clause addresses "misunderstandings to the meaning or intent" of the agreement.

Unquestionably, disputes may occur regarding applications of an agreement without encompassing a misunderstanding about the meaning of a provision or the intent of the parties.

Article XX of the National Agreement supports that narrower interpretation, restricting the use of the grievance process and the arbitrator's authority:

> When a disagreement exists between the Employer and a local union *concerning whether or not a given provision of the local agreement should apply, or regarding the intent, meaning, application or compliance with the terms of this Agreement*, it shall be resolved in accordance with the grievance procedure covered in this article.
> 
> . . .
> 
> The authority of the Arbitration Board and of the impartial arbitrator *shall be limited to the interpretation and enforcement of the express language of this Agreement* as applied to the specific grievance or issue stated in the request for arbitration. . . .

(Compl. Ex. 1: National Agreement, Art. XX, ¶¶ 66, 70 (emphasis added).)  Similarly, the local Master Agreement also limits the arbitrator's authority "to interpretation and application of the collective bargaining agreement."  Taken together, the provisions do not clearly and unmistakably waive the judicial forum for § 303 claims.

Moreover, even were the Court to find the "clear and unmistakable standard of *Wright* to be inapplicable to Plaintiff employers, the plain meaning of the provisions would not permit a conclusion that the parties intended to waive a judicial forum for statutory claims. Following *Wright*, it is clear that, at a minimum, the presumption of arbitrability does not extend beyond the interpretation of collective bargaining agreements. *Wright*, 525 U.S.

at 78.  Textual analysis, applied without the presumption, does not demonstrate the parties

intended to subject to arbitration "matters that go beyond the interpretation and application

of contract terms . . . ."  *Id.* at 79.

Accordingly, the Court concludes that it retains jurisdiction to decide Plaintiffs' § 303

claim because Plaintiffs were not required by the agreement to submit their dispute to

arbitration.

### 2.     Merits of § 303 claim

In order to establish a violation under § 8(b)(4), a plaintiff must satisfy a two-part

inquiry:

> The first requirement focuses on the *nature* of the union's conduct: 'whether
> the union threatened, coerced or restrained any person within the meaning of
> the section.' . . . The second prong relates to the *purpose* of the union's
> conduct: 'whether an object was to force any person to cease doing business
> with another.'

*Printpack, Inc. v. Graphic Comm. Union Local 761-S*, 988 F. Supp. 1201, 1204 (S.D. Ind.

1997 (emphasis in original) (quoting *Brown & Root, Inc. v. Louisiana State AFL-CIO*, 10

F.3d 316, 320 (5th Cir. 1994)).  In order for a labor organization to violate the statute, the

union "'must engage in *unlawful activity* against a *neutral* employer for an *unlawful*

*objective*.'"  *Id.* (emphasis in original).  In determining whether a union's conduct is

statutorily prohibited, a court must consider the union's entire course of conduct.  *Id.*

The parties agree that the section has been interpreted to apply only to secondary

activity, not primary activity.  *See Local 761, Int'l Union of Electrical, Radio & Machine*

21

*Workers v. NLRB*, 366 U.S. 667, 671 (1961); *Local 1976, United Bhd. of Carpenters v. NLRB*, 357 U.S. 93, 98 (1958). Section 8(b)(4) was designed to prohibit secondary boycotts against neutral parties during a dispute between employees and their employers. *Local 761*, 366 U.S. at 673.

Plaintiffs allege that Defendant Local 333 threatened, coerced or restrained Dard employees from doing business with Eifert, in violation of the above-quoted section. Plaintiffs argue that Dard must be considered a neutral secondary employer and Eifert the primary employer and that the conduct must be considered to have been directed at Dard.

In support of their claim, Plaintiffs rely upon *Taylor Milk Co. v. Int'l Bhd. of Teamsters*, 248 F.3d 239 (3d Cir. 2001). In *Taylor Milk*, a local union (Local 205), which represented employees of the purchasing company (TMC), by and through its international union representative (Fred Gregare), interfered with contract negotiations between another local of the same union (Local 377) and the selling employer (Borden). The contemplated sale of Borden to TMC was dependent on the existence of a harmonious relationship between Borden and its union. According to the court's recitation of facts, Gregare falsely advised Local 377 that it was exercising a contract clause that purportedly gave jurisdiction over the Borden plant to Local 205 and required Gregare to approve any contract reached by Local 377. Gregare took over negotiations with Borden and refused to negotiate further, notwithstanding the requests of Local 377. The contemplated purchase fell through, the plant was closed, and Borden's employees (members of Local 377) were terminated. The purpose

22

behind the interference was to prevent TMC from shifting production jobs to the newly acquired plant and terminating Local 205 production workers at the original facility.

On appeal, the Third Circuit recognized that the sale of a plant by one company to another ordinarily was not considered "doing business" within the meaning of 29 U.S.C. §§ 158(b)(4)(ii)(B) and 158(e). *See Taylor Milk*, 248 F.3d at 246 (citing *Amax Coal Co. v. NLRB*, 614 F.2d 872, 885-85 (holding that "doing business under § 158(e) refers to a continuing business relationship, not to the sale of a facility). However, the court concluded that, because Local 205 interfered with the continuing, long-term negotiations between buyer and seller through interference with the Borden's labor negotiations with Local 377, the circumstances met the "doing business" requirement of § 158(b)(4).

The Third Circuit's first conclusion in *Taylor Milk* – that the sale of one company to another did not constitute "doing business" within the meaning of § 158(b)(4) – was consistent with numerous decisions of the NLRB and other courts. *See Lone Star Steel Co. v. NLRB*, 639 F.2d 545, 548 (10th Cir. 1981) (sale or transfer of a mine that was likely to continue to retain the same employees "would merely substitute one entity for another while the business continued to operate without interruption, and therefore would not constitute 'doing business' within the meaning of § 8(e)"); *Int'l Ass'n of Machinists and Aerospace Workers (Harris Truck and Trailer Sales, Inc.)*, 224 NLRB 100 (1976) (same); *Int'l Union of Operating Engin., Local No. 701 (Cascade Employers Ass'n, Inc.)*, 221 NLRB 751, 752 (1975). *See also Super Fresh Food Markets, Inc. v. United Food and Commercial Workers*

23

*Local Union 1776*, 249 F. Supp. 2d 546, 553 (E.D. Pa. 2003) (where there is no ongoing relationship that could "be used to pressure the purchaser to accede to the Union's demands," . . . the sale of a store does not constitute "doing business").   The second conclusion, in contrast, was highly dependent on the unusual circumstances of the case.   In reaching its decision, the *Taylor Milk* court relied both on the extended period of the negotiations and on the interference of a separate local union in the negotiations between the seller and its own local.

Although neither party has raised the issue, it appears that Defendant's alleged coercion is not within the "doing business" requirement of § 158(b)(4).   The circumstances of this case appear closer to a simple sale of a business that "would merely substitute one entity for another while the business continued to operate without interruption . . . ."   *Lone Star*, 639 F.2d at 548; *see also Super Fresh*, 249 F.2d at 553; *Amax*, 614 F.2d at 885-87 (sale of operations does "not constitute a continuing business relationship because there would be no further business between Amax and the purchaser").   Although *Taylor Milk* bears some superficial relationship to the instant case, the conduct in issue was significantly different. In *Taylor Milk*, unlike in the allegations of the instant complaint, the union engaged in substantial conduct directed at the operations of Borden and its negotiations with its own employees so as to prevent Borden from maintaining the good relationship with its local union necessary to consummate the sale.   The purpose of the disruption was solely for the benefit of members of Local 205, not Local 377, and clearly was designed to impair the

24

working relations between Borden and its own employees.  In contrast, the allegations of the
instant complaint are limited to alleged coercion not designed to disrupt the relationship
between Dard and its employees, but designed to prevent those employees from working for
Eifert once Dard no longer controlled the company.

However, even were the contemplated sale of Dard to Eifert properly considered
"doing business" within the meaning of § 8(b)(4)(ii)(B), the alleged coercion in the instant
case was not a violation of § 8(b)(4) because, unlike in *Taylor Milk*, the purpose of the
alleged conduct was primary, not secondary.  In *Taylor Milk*, the purpose of Local 205's
conduct was to disrupt the relationship between Local 377 and Borden.  At no time did Local
205 act to further the interest of the Local 377 employees of Borden, and Borden clearly was
an entirely neutral secondary employer in its relation to Local 205.  Local 205's conduct was
designed to prevent a sale that could result in TMC eventually eliminating Local 205 jobs
while continuing Local 377 jobs.  The purpose of the interference, therefore, unquestionably
was secondary.

In the instant case, in contrast, the allegations of the complaint all involve Local 333's
alleged motive to prevent union members from working for Eifert.  The alleged dispute was
with Eifert and the alleged coercion was of individuals who were being asked to work for
Eifert. The allegations of the complaint represent only that Dard employees were coerced to
leave rather than work for Eifert after Dard was sold.  According to the allegations of the
complaint, Wade intended to cease operating Dard as a business.  Indeed, Plaintiffs

specifically allege that four of the five service employees advised Wade that they would not go to work for Eifert while they remained employed with Dard.  Only after Wade informed them that she intended to cease operating Dard as a business did they quit their employment.  The alleged conduct therefore was not directed at Dard, but at Eifert, regardless of any secondary effect the coercion may have had on Dard's ability to sell its business to Eifert.  *See Nat'l Woodwork Mfrs Ass'n v. NLRB*, 386 U.S. 612, 632 (1967) (primary activity does not become unlawful under the statute simply because of its incidental secondary effects); *Super Fresh*, 249 F. Supp. 2d at 556 (focusing on the purpose of the union's conduct in relation to the employees it represents in determining whether purpose was primary or secondary).   The alleged coercion in the instant case was not of Dard's employees in their relationship with Dard, but instead was of prospective Eifert employees in order to affect their decision to work for Eifert.[2]  Because the coercion alleged was primary in its purpose, the complaint fails to state a valid § 8(b)(4) violation.

---

[2]The Court notes that Plaintiffs make several allegations that are irrelevant to the resolution of the claim in issue but focus the reader on the apparent unfairness of coercing Dard employees to leave Dard rather than work for Eifert.  Specifically, Eifert alleges that customer loyalty is to the service person rather than to the service company.  As a result, in deciding not to work for Eifert, all of the Dard service employees effectively appropriated the value of the Dard business by taking their customers with them.  Although the Court fully acknowledges the apparent unfairness and recognizes that such conduct may violate the union's contract obligations not to discriminate against signatory employers, the fact that Dard did not have customer loyalty and did not have measures in place to protect its client base is not relevant to the nature of the union action alleged in Count V of the complaint.

Moreover, even were the Court to find that the alleged coercive conduct was secondary in purpose, the claim nonetheless would not fall within the type of secondary conduct prohibited under § 8(b)(4).  *See Local 1976*, 357 U.S. at 98 (noting that not all secondary conduct is prohibited under § 8(b)(4)).   "The purpose of § 8(b)(4) is to protect secondary employers who are neutral, not those who knowingly assist the primary employer in connection with the labor dispute." *Kable Printing Co. v. NLRB*, 545 F.2d 1079, 1085 (7th Cir. 1976).  *See also Int'l Longshoremen's Ass'n v. Allied, Inc.*, 456 U.S. 212, 225 (1992) (observing that § 8(b)(4) of the NLRA was drafted "to protect neutral parties, the helpless victims of quarrels that do not concern them at all") (internal quotations omitted); *District 30, UMW v. NLRB*, 819 F.2d 651 (6th Cir. 1987).

The courts regularly have recognized that "where the secondary employer against whom the union's pressure is directed has entangled himself in the vortex of the primary dispute," the employer is not neutral and therefore is not prohibited by § 8(b)(4).  *Nat'l Woodwork*, 386 U.S. at 687; *see also California Cartage Co. v. NLRB*, 822 F.2d 1203, 1210 (D.C. Cir. 1987) ("We have on several occasions held that the interrelationship between employers can be so close that neither can be regarded as a 'neutral' or secondary employer.").

Plaintiffs, citing *Carpet, Linoleum, Soft Time, Local 419 v. NLRB*, 429 F.2d 747 (D.C. Cir. 1970), correctly note that this is not an appropriate situation for application of the "ally doctrine," which excludes from § 8(b)(4) secondary activity directed at a secondary employer that has made itself an ally of the primary employer.  In its formal description, the ally

27

doctrine applies only to those circumstances in which the secondary employer performs struck work or when the businesses are really a single economic enterprise with common control of labor relations and integration of business operations. *See also Boich Mining Co. v. NLRB*, 955 F.2d 431, 434 (6th Cir. 1992); *Teamsters Local 560 (Curtin Matheson)*, 248 NLRB 1212, 1213 (1980).  Because the formal ally doctrine only applies to circumstances in which a union is engaged in a strike or a boycott, the doctrine cannot practically be applied here, where no formal strike or boycott is alleged.

Nevertheless, the rationales underlying the ally doctrine are based on the Congressional purpose behind § 8(b)(4).  Those rationales and purpose are appropriately applied to the facts alleged in the instant case.  As courts routinely have observed, determination of the neutrality of the secondary employer under § 8(b)(4)

> cannot be answered by the application of a set of verbal formulae.  Rather, the issue can be resolved only by considering on a case-by-case basis the factual relationship which the secondary employer bears to the primary employer up against the intent of the Congress as expressed in the Act to protect employers who are "wholly unconcerned" and not involved in the labor dispute between the primary employer and the union.

*Curtin Matheson*, 248 NLRB at 1214 (quoting *Vulcan Materials Co. v. United Steelworkers of Am., AFL-CIO*, 430 F.2d 446, 451 (5th Cir. 1970).  The real question is whether the companies "have such identity and community of interests as negative the claim that [the secondary employer] is a neutral employer." *Curtin Matheson*, 248 NLRB at 1213-14.

28

> None of the individual factors determining neutrality is considered in isolation; "rather the Board weighs all of them to determine whether in fact one employer is involved in or is wholly unconcerned with the labor disputes of the other."

*Id.* at 1214 (quoting *Local 282, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers (Acme Concrete & Supply Corp.)*, 137 NLRB 1321, 1324 (1962)).

In the instant case, while ownership of Dard by Eifert was not yet accomplished, Dard's entire interest in the sale was identical with that of Eifert and had nothing to do with Dard employees performing work for Dard. Dard was aware that Eifert was involved in a dispute with Local 333 under which (according to the complaint) Local 333 sought to limit the placement of local union members with Eifert. Yet Dard sought to ensure that its employees would become employees of Eifert after Dard ended its operations. Thus, Dard was in no way neutral to the dispute. Instead, it was clearly taking a position in favor of Eifert, vigorously seeking to ensure that Dard employees went to work for Eifert after Dard ceased operating its own business. As a consequence, even if the Court were to find that Defendant Local 333's conduct was not primary in its purpose, it would conclude that Dard was not a neutral secondary employer entitled to the protections of § 8(b)(4).

For all of the stated reasons, the Court concludes that Plaintiffs have failed to state a cognizable claim under § 303 of the LMRA for damages arising from a violation of § 8(b)(4) of the NLRA.

C.     Counts I, II, & III: State-Law Claims

In Counts I, II and III of the complaint, Plaintiffs raise a series of state-law tort claims.
Count I alleges that Defendants Local 333, Rahar and Haggart tortiously interfered with a
business relationship, expectancy and/or contract between Dard and Eifert.  Count II alleges
that Defendants Local 333, Rahar and Haggart tortiously interfered with a business
relationship or expectancy between Dard and its employees.   Count III alleges that
Defendants Local 333, Rahar and Haggart tortiously interfered with a business relationship
between Dard and its customers.  The central issue for resolution of Counts I through III is
whether the state-law claims are preempted by federal law.

Defendants argue two bases for preemption.  First, Defendants argue that the claims
are completely preempted by § 301 of the LMRA because they require interpretation of a
collective bargaining agreement.  Second, Defendants assert that, even if they are not
preempted by § 301 of the LMRA, they are preempted by § 8(b)(1) of the NLRA under the
doctrine of *San Diego Building Trades v. Garmon*, 359 U.S. 236, 245 (1959), which protects
the exclusive jurisdiction of the NLRB to resolve state-law claims that relate to conduct that
is arguably protected or prohibited by the NLRA.

1.     **Section 301 Preemption**

It is well settled that state-law claims that are "inextricably intertwined" with
consideration of the terms of a labor agreement are preempted by § 301 of the LMRA.  *Allis-
Chalmers v. Lueck*, 471 U.S. 202, 220 (1985); *Mattis v. Massman*, 355 F.3d 902, 905 (6th

Cir. 2004).  Not "every state-law suit asserting a right that relates in some way to a provision in a collective bargaining agreement . . . necessarily is preempted." *Allis-Chalmers*, 471 U.S. at 220.  Instead, under *Allis-Chalmers*, a state-law claim is preempted "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between parties in a labor contract." *Id.  See also Livadas v. Bradshaw*, 512 U.S. 107, 123-24 (1994); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409-10 (1989).

The Sixth Circuit has adopted a two-step inquiry to determine whether a state tort claim is sufficiently independent to survive § 301 preemption:

> First, courts must determine whether resolving the state law claim would require the interpretation of the terms of the collective bargaining agreement. Second courts must ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state law.

*Mattis*, 355 F.3d at 906 (citing *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994)).  A claim that fails either prong of the test is preempted. *Id.*  The reviewing court must look beyond the face of the complaint to determine whether the essence of the claim is really a disguised claim of contract. *DeCoe*, 32 F.3d at 216.  Further, a claim will be preempted if it requires the court either to interpret a term of the CBA or to address relationships created through the collective bargaining process and mediate a dispute based on the rights created. *Id.* at 218.

In Michigan, the claims of tortious interference with business relations, expectancy and contract all require that a defendant's conduct either be *per se* unlawful or be a lawful act done with malice and without legal justification. *See Derderian v. Genesys Health Care*

31

*Sys.*, 689 N.W.2d 145, 158-59 (Mich. Ct. App. 2004).  A person is not liable for tortious interference with a contract if he is motivated by legitimate personal or business interests. *See Wood v. Herdon & Herdon Investig., Inc.*, 465 N.W.2d 5, 8 (Mich. Ct. App. 1990).

Defendants argue that the sole basis for Plaintiffs' claim of unlawful or improper conduct is that Defendants' conduct violated the contract.  Plaintiffs respond that they do not rely on the contract, but instead claim that Defendants used economic threats and coercion that were wrongful, independent of any contract provision.   Plaintiffs, however, fail to identify the nature of the alleged threats or how Defendants' alleged conduct was either *per se* wrongful or done with malice.  "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances."  *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 635 (Mich. Ct. App. 1992).  Plaintiffs allege only that they are aware of earlier comments and conduct by Defendants to other Eifert employees suggesting "discriminatory" treatment of Eifert under the contract.  (Compl. ¶¶ 42-47.)  They further allege that that motivation for Defendants discriminatory treatment was Eifert's reliance on contract provisions the union perceived as disadvantageous to its members.  A union or a union official undoubtedly has a business interest in ensuring that union members are employed by companies serving the best interest of union members.  With the exception of the contractual prohibition on the alleged discriminatory conduct, Plaintiffs have not pointed the Court to any basis for finding Defendants' conduct to be *per se* unlawful.

32

To demonstrate that they do not intend to rely upon the collective bargaining agreement to establish their tort claims, Plaintiffs ask the Court to assume that no collective bargaining agreement existed and to assume further that a different third party, such as a competitor, successfully coerced Dard employees to quit Dard and not work for Eifert. Plaintiffs suggest that such interference necessarily would form the basis of a tortious interference claim. However, under previously cited Michigan law, such interference would not form the basis of the claim unless the action was taken out of malice or was *per se* wrongful. *See also Feldman v. Green*, 360 N.W.2d 881, 887 n.1 (Mich. Ct. App. 1985) (citing *Louis Schlesinger Co. v. Rice*, 72 A.2d 197, 202-03 (N.J. 1950) (reciting historical origins of the tort) ("The luring away by devious, improper and unrighteous means of the customer of another falls into this category. If the disturbance or loss to one in his business is a mere incident of competition, or the exercise of like rights by others, it is *damnum absque injuria*, unless some superior right by contract or otherwise is interfered with. But if it comes from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, then it stands upon a different footing.") (internal quotations omitted). Under Plaintiffs' hypothetical, if a competitor attempted to convince Dard employees to leave because it wanted to employ them itself, or if it was engaged in other competitive activity seeking its own business advantage, the tort claim would be unsupported unless the conduct was *per se* wrongful, *e.g.*, conduct that violated state law or public policy or conduct that breached some private contract. *Id.*; *see*

33

*also Mich. Podiatric Medical Assoc. v. National Foot Care Prog., Inc.*, 438 N.W.2d 349, 355 (Mich. Ct. App. 1989); *Formall, Inc. v. Comm. Nat'l Bank*, 421 N.W.2d 289 (Mich. Ct. App. 1988).

Plaintiffs have failed entirely to allege any facts that would support the existence of *per se* unlawful activity or malice.  Instead, they rely on the same fundamental facts that underlie their claims under the collective bargaining agreement.  The gravaman of their state tort claims remains the claim that Plaintiffs discriminated against Defendants in the application of the collective bargaining agreement.  This question is inextricably intertwined with and requires interpretation of the collective bargaining agreement.  *See Allis-Chalmers*, 471 U.S. at 220; *Mattis*, 355 F.3d at 906; *Adkins v. Gen. Motors Corp.*, 946 F.2d 1201, 1211-12 (6th Cir. 1991) (finding tortious interference with contract claim to be inextricably intertwined with collective bargaining agreement).

For similar reasons, the claims do not pass the second prong of the *DeCoe* test.  The rights claimed by Plaintiffs were created by the collective bargaining agreement rather than by state law.  *DeCoe*, 32 F.3d at 216.  Where the wrongfulness of Defendants' conduct inevitably will turn on the relationship between the parties established by the collective bargaining agreement, the rights upon which Plaintiffs base their state-law claims are not fundamentally established by state law.  *Id.*

The instant case is entirely distinguishable from the cases of *Dougherty v. Parsec*, 872 F.2d 766 (6th Cir. 1989), and *Fox v. Parker Hannifin Corp.*, 914 F.2d 795 (6th Cir. 1990),

cited by Plaintiffs. *Dougherty* involved alleged tortious interference by a party who was not a signatory to the collective bargaining agreement. *Fox*, in turn, did not involve issues exclusively addressed by the collective bargaining agreement. Moreover, neither *Dougherty* nor *Fox* applied the two-prong test subsequently set forth in *DeCoe*, which is binding upon this Court. *Cf. Lovely v. Aubrey*, No. 98-5871, 1999 WL 701921, at *4 (distinguishing *Fox* and *Dougherty* to find claim of tortious interference with contract preempted).

For all the stated reasons, the Court concludes that Plaintiffs' state tort claims are preempted by § 301 of the LMRA.

## 2.   *Garmon* Preemption

Defendants next argue that the claims are preempted by the doctrine of *Garmon*, 359 U.S. 236. They contend that, in order to resolve Plaintiffs state-law claims, this Court would be required to judge the legality of conduct arguably protected or prohibited by the NLRA.

In *Garmon*, 359 U.S. at 245, the Supreme Court held that the NLRA preempts state actions involving conduct that arguably is either protected or prohibited by the NLRA. *Garmon* preemption protects the exclusive jurisdiction of the NLRB. *Id.* at 242-44. The rationale for the doctrine is that Congress has entrusted national labor policy to the centralized administrative agency with specialized expertise. *Id.* Permitting state or federal courts to reach incompatible or conflicting decisions would undermine the uniformity of national labor policy. *See id.* at 243. As a result, when a cause of action arguably is subject

35

to Section 7 or 8 of the NLRA, both state and federal courts are required to defer to the exclusive jurisdiction of the NLRB.  *Id.* at 245.

Section 8(b)(1)(A) of the NLRA forbids a labor organization or its agents from "restrain[ing] or coerc[ing] employees in the exercise of the rights guaranteed in Section 7." Section 7 of the Act protects "the right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."  29 U.S.C. § 157.  A variety of NLRB cases have held that coercion by union agents to convince employees to quit their jobs are within the jurisdiction of the NLRB. *See UE&C Catalytic, Inc.*, 318 NLRB 443 (1995); *Nat'l Glass & Glazing, Inc.*, 299 NLRB 35 (1990); *Sachs Elec. Co.*, 248 NLRB 669, 669-70 (1980).  Plaintiffs cite no contrary authority.  Instead, they merely argue without citation to authority that, in order to violate § 8(b)(1) and bring the action within the jurisdiction of the NLRB, the conduct in issue must be coercion for the purpose of encouraging or discouraging union activity.

Plaintiffs' argument unnaturally restricts the language of § 8(b)(1).  First, the provision's protection is not limited solely to encouraging or discouraging union activity. Instead, the language protects both "the right to . . . assist labor organizations" and "other concerted activities for the purpose of . . . other mutual aid or protection."  The alleged conduct in the instant case clearly falls within the statutory language.  The Court therefore rejects Plaintiffs' argument that the coercion prohibited under § 8(b)(1) is limited to coercion

for the purpose of encouraging or discouraging union activity. Second, it is doubtful that the alleged wrongful communications between a union and union members about an unfavored employer who is a signatory to a collective bargaining agreement could be interpreted as anything other than "activity for the purpose of encouraging or discouraging union activity." The lawfulness of the conduct therefore falls within the jurisdiction of the NLRB.

Plaintiffs next contend that all of the cases cited by Defendants are cases in which the charging party was the coerced employee. They fail, however, to cite any authority for their suggestion that the rule is different when the complaining party is an employer. The Court finds no support for Plaintiffs' proposed distinction.

Plaintiffs also assert that their tort claims fit one of the exceptions to *Garmon*: (1) the conduct "touches on interests so deeply rooted in local feeling and responsibility that, in the absence of compelling Congressional direction, it could not be inferred that Congress intended to deprive the states of the power to act"; (2) the conduct at issue "can be considered a peripheral concern of the Act"; or (3) the state cause of action "does not interfere with the effective administration of national labor policy." *Price v. United Mine Workers. of Am.*, 336 F.2d 771 (6th Cir. 1964).

Plaintiffs' arguments are not compelling. First, in asserting that their claims are excepted from *Garmon* because they touch on deeply rooted state concerns, Plaintiffs rely upon cases involving particularly abusive conduct, such as malicious destruction of property, *see Clemence v. Meijer, Inc.*, 716 F. Supp. 298, 299 (W.D. Mich. 1988), and *Price*, 336 F.2d

771; intentional infliction of emotional distress, *see Farmer v. United Bhd. of Carpenters & Joiners*, 430 U.S. 290, 302 (1977); and threats of violence, *see Serrano v. Jones & Laughlin Steel Co.,* 720 F.2d 1279 (6th Cir. 1986), and *Price*, 336 F.2d 771. In the entirety of their complaint, Plaintiffs make no allegation of interference or coercion that included threats of violence or threats to destroy property.  Nor do Plaintiffs allege conduct that was motivated by malice rather than economic interest.  Instead, while Plaintiffs allege few specifics about the purported coercion, the allegations in ¶¶ 42 to 46 about other Eifert employees involve nothing more than coercion through threats to impede referrals from the hiring hall.  On its face, the NLRA directly concerns the regulation of the contracts and relationships in a collective bargaining situation.

Second, inasmuch as the language of § 8(b)(1) expressly "prohibits restrain[t] or coerc[ion] of employees in the exercise of the rights guaranteed in Section 7," the second exception clearly is inapplicable.  Interference with contract and with business relationships based on coercion such as that alleged in the complaint undoubtedly fell within the contemplation of Congress when it decided to regulate those relationships and contracts.  *See Farmer*, 430 U.S. at 302 (concluding that claims other than intentional infliction of emotional distress were preempted).  Indeed, Plaintiffs' argument is directly undermined by their own citation to the Supreme Court's decision in *Farmer*.  The *Farmer* Court declined to extend *Garmon* preemption to damages for severe emotional distress and physical injury caused by

egregious threats of discrimination and violence.  However, the Court strictly limited the exception:

> Union discrimination in employment opportunities cannot itself form the underlying 'outrageous' conduct on which the state-court tort action is based; to hold otherwise would undermine the preemption principle.  Nor can threats of such discrimination suffice to sustain state-court jurisdiction.  It may well be that the threat, or actuality, of employment discrimination will cause a union member considerable emotional distress and anxiety.  But something more is required before concurrent state-court jurisdiction can be permitted."

*Id.* at 305.  The *Farmer* Court further limited the holding to circumstances in which the tort required "outrageous" conduct, holding that "[t]he potential for undue interference with federal regulation would be intolerable if state tort recoveries could be based on the type of robust language and clash of strong personalities that may be commonplace in various labor contexts."  *Id.* at 305-06.  In sum, under *Farmer*, "it is essential that the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself."  *Id.* at 305.  In their claims of tortious interference, Plaintiffs have alleged nothing more than the sort of economically coercive threats distinguished in *Farmer*.  The allegations of the complaint do not meet the exceptions to *Garmon* preemption.[3]

--------

[3]Even were the state-law claims not preempted, the Court would decline to exercise supplemental jurisdiction over those claims.  Where a district court has exercised jurisdiction over a state law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the state law claims should be dismissed without reaching their merits.  *See Landefeld v. Marion General Hosp.*, 994 F.2d 1178, 1182 (6th Cir. 1993); *Faughender v. City of North Olmsted, Ohio*, 927 F.2d 909, 917 (6th Cir. 1991); *Coleman v. Huff*, No. 97-1916, 1998 WL 476226, at *1 (6th Cir. Aug. 3, 1998).

## IV.

For the foregoing reasons, the Court will grant Defendants' motions to dismiss.  A judgment consistent with this opinion shall be entered.


Dated:      March 13, 2006           /s/ Robert Holmes Bell
                                     ROBERT HOLMES BELL
                                     CHIEF UNITED STATES DISTRICT JUDGE